## Case No. 17,318.
### WEBB v. ANDERSON.
[Taney, 504.] [1]

Circuit Court, D. Maryland. April Term, 1858.

CHARTER PARTY—LIEN FOR FREIGHT—ASSIGNMENT OF BILLS OF LADING TO SECURE ADVANCES—DELIVERY OF CARGO—WAIVER OF LIEN—BANKRUPTCY.

1. The vessel, of which the libellant was master, was chartered to take a cargo of flour from City Point, in Virginia, to Rio Janeiro, and taking in a cargo of coffee at Rio, to proceed to Baltimore; the charterer was to pay $1.25 per barrel on the flour, in full for the hire of the vessel for the round voyage: so much thereof as might be needed for expenses, was to be paid to the master at Rio, and the balance, on the

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

arrival of the vessel at Baltimore. The charterer obtained from L. G. (the claimant) large advances upon the flour, and endorsed the bills of lading (which were "to order") to L. G., who endorsed them to his agent at Rio, with directions to purchase coffee with the proceeds, to be shipped to him at Baltimore: the agents of L. G., at Rio, took possession of the flour, on its arrival, and shipped, by the same vessel, to Baltimore, one hundred and thirty bags of coffee, consigned to L. G.: on the arrival of the vessel at Baltimore, the charterer having meanwhile stopped payment, the coffee consigned to the claimant, was taken possession of, under these proceedings, to meet the owner's claim for the freight due by the charterer: the net proceeds of the sale of the flour at Rio did not cover the whole amount of the claimant's advances on it, and the consignment of coffee was insufficient to make up the deficit. Held, that if the coffee be regarded as the property of the charterer, and shipped by his agents, and the claim of L. G. nothing more than a lien upon it, it would be liable to the whole amount of the freight due under the charter-party.

2. As between charterer and ship-owner, it is always implied, unless there be an express contract to the contrary, that the freight must be paid before the delivery of the cargo.

3. If the interest which the claimant acquired in the flour was a mere lien which attached itself to the proceeds, and to the coffee purchased with the proceeds, then the lien for freight would be prior, and preferred to his.

4. But the interest of L. G. (the claimant) in the coffee, was something more than a mere lien; it was his property, and the charterer had no right to the possession or control of it, nor to the proceeds, unless a surplus remained, after satisfying the amount to secure which the flour had been transferred to the claimant.

5. The lien of the ship-owners upon the return cargo, under this charter-party, did not depend upon the funds with which it was purchased.

6. The claimant was a mortgagee of the flour, and nothing more; but to the extent of his interest, his rights stand on the same ground as if he had been the purchaser; and to that extent he is to be considered the purchaser and owner of the flour, from the time of the assignment and delivery to him of the bills of lading.

7. The claimant, however, purchased subject to existing claims, and whatever rights the ship-owners had, at that time, acquired under the charter-party, either to the outward or inward cargo, remained unchanged.

8. The delivery of the flour to the agents of the claimant at Rio, was a delivery to the claimant, who therefore held it, by reason of such delivery to him, discharged of any lien for freight, and consequently, when the flour was sold, there could be no lien upon the proceeds.

9. Under these circumstances, the coffee was purchased with the claimant's money, and shipped as his property at the ordinary freight.

10. If the bill of lading signed by the master was in violation of his duty, or inconsistent with the charter-party, it would not impair the rights of the ship-owners.

11. But this charter-party does not contain the usual clause by which the owner binds the ship, and the charterer binds the cargo to the performance of all the covenants in the charter-party, and upon general principles of law, the merchandise is bound for its own transportation only, and its liability cannot be extended further, except by stipulations in the charter-party under which the voyage was performed.

In admiralty. The libel in this case was filed by the late Judge Glenn, on the 20th of

November, 1851, while at the bar, but being appointed district judge, during the pendency of the cause, it was, under the act of congress, transferred to the circuit judge (TANEY, Chief Judge), to be tried before him. The freight in question was earned under the following charter-party: "This charter-party entered into this eighth day of May A. D. 1851, between Beverly Clopton, as agent of British barque Invincible, and Thomas Davies, master, burden two hundred and eighty-nine tons, now lying in the harbor of City Point, of the one part, and David Anderson's Son, of the other part: witnesseth that the said Beverly Clopton, as agent, and Thomas Davies, as master aforesaid, for the consideration hereinafter mentioned, have let on freight, unto the said David Anderson's Son, the whole tonnage of the said vessel, excepting the cabin and other necessary room for the stowage of her dunnage, tackle, provisions and furniture, for a voyage to be made with the said vessel, in manner hereinafter mentioned; and the said Beverly Clopton, agent, and Thomas Davies do hereby promise, that the said vessel shall be staunch, strong, well-apparelled, and furnished with all things necessary for the intended voyage, and that she shall receive from the said David Anderson's Son a full and complete load of flour, at Port Walthall, where said barque shall come, and when the said loading is so completed, to depart with the first favorable wind and weather, and without delay unnecessary, proceed to the port of Rio Janeiro; the said flour to be delivered at said Port Walthall, alongside of said barque, at the risk and expense of said charterer, and on her arrival at said port of Rio, or as near thereto as vessels of her size can approach, shall, there and then, deliver her said cargo of flour within reach of the vessel's tackle, to the agents or assigns of the said David Anderson's Son; the said vessel to be furnished by the agents or assigns of said David Anderson's Son, with a cargo of coffee, or other articles, or so much thereof as may be necessary for ballast, which is to be delivered alongside of said vessel, which said vessel or barque aforesaid shall then proceed on her voyage to Baltimore, in the state of Maryland, where the cargo is to be discharged; and being there arrived, the said loading to be delivered to the said David Anderson's Son, agents or assigns, and thus to end the intended voyage; excepting always against the dangers of the seas, robbers, pirates, restraint of princes and rulers, and all unavoidable accidents and calamities. For and in consideration of which, the said David Anderson's Son does promise and agree to and with the said Beverly Clopton, agent, and Thomas Davies, master, that there shall be paid unto the said Thomas Davies, master, or his successor in office, freight, at the rate of one dollar and twenty-five cents per barrel, on the outward cargo, with five per cent. primage thereon, which is to be regarded as full compensation of freight out and home for the voyage; the said barque being bound to bring

home a full cargo of coffee, or other articles, to Baltimore, free of additional freight; it being understood, however, that the said master shall be paid so much of his freight in Rio, as may be required for his expenses there, without commissions. And the said David Anderson's Son will load the barque here with dispatch; and further promises and agrees to allow thirty working days to load the barque at Rio, including the number of days required and necessary to discharge the same after arrival at that port; and the said David Anderson's Son further promises and agrees, that if the said vessel shall be detained longer than the days allowed, then there shall be paid to the captain of the vessel, or his assigns, demurrage, at the rate of twenty dollars per day, day by day, as the same may become due. And for the due performance of all and singular the foregoing obligations, the parties bind themselves each to the other in the penal sum of one thousand dollars. The vessel, on her return to Baltimore, to be consigned to the friends of the charterer there, and to pay two and a half per cent. commission on three thousand dollars, instead of whole amount of freight. In witness whereof, the parties interchangeably set their hands and seals, the day and year aforesaid. Beverly Clopton. [Seal.] Thomas Davies. [Seal.] David Anderson's Son. [Seal.] Signed, sealed and delivered in presence of Wm. B. Dubney (as to all the parties)."

J. Glenn, for libellant.
J. Nelson and A. S. Ridgely, for claimant.

TANEY, Circuit Justice. The libellant [William C. Webb] is the owner of the British barque Invincible, and this controversy arises out of a charter-party, by which the vessel was let to freight to David Anderson's Son, a merchant in Richmond. The contract on behalf of the vessel was executed by Beverly Clopton, as agent, and Thomas Davies, as master, and stipulated on their part that she should receive from David Anderson's Son, a complete load of flour, at Port Walthall (City Point, on the James river), and proceed to Rio Janeiro, and there deliver the cargo to the agents or assigns of the charterer, the said agents or assigns to furnish a cargo of coffee or other articles, or so much thereof as might be necessary for ballast, with which the vessel was to proceed to Baltimore, where the cargo was to be discharged, and the same being delivered to the charterer's agents or assigns, the intended voyage to be ended. And in consideration of the premises, Anderson's Son agreed to pay the master, or his successor in office, at the rate of one dollar and twenty-five cents per barrel, on the outward cargo, with five per cent. primage, which was to be regarded as full compensation of freight out and home, for the voyage; the said barque being bound to bring home a full cargo of coffee, or other articles, to Baltimore, free of additional freight; it being understood, however, that the master should be paid so much of his freight in Rio,

as might be required for the expenses there, without commissions.

The barque sailed accordingly, laden with three thousand four hundred and fifty barrels of flour, and arrived at Rio, where the cargo was delivered; only seven hundred and twenty-seven barrels were shipped by Anderson's Son; the residue of the cargo was shipped on freight by other persons. In order to enable Anderson's Son to make this shipment, they obtained from Lambert Gittings, the present claimant, an advance of two thousand four hundred and ninety dollars, upon the following terms, as stated in a letter to him, dated 22 May 1851:

"I have decided to let it go forward on my account, and submit its sale and management to your address, to be consigned by you to such house as you may think proper, and sold on arrival, as you may direct, or to be held by you, as you may judge most to my interest. I submit the entire management of this small shipment to your own discretion, to manage as if your own. I have filled up the bills of lading at the current rate of freight at which the balance of the cargo is shipped."

At the time this letter was written, only five hundred barrels had been shipped by Anderson's Son, upon which the advance by the present claimant was seventeen hundred dollars; afterwards, two hundred and twenty-seven barrels, in addition, were purchased and shipped upon the same terms, upon which the claimant advanced seven hundred and ninety dollars. The bills of lading, signed by the master, stated the shipment to be made by Anderson's Son, and to be deliverable at Rio, to their order or assigns; and they were endorsed and delivered by Anderson's Son to Lambert Gittings, the claimant, making the flour deliverable to his order.

The ship was consigned by the charterer to Maxwell, Wright & Co.; but the flour shipped, as above mentioned by the charterers, was consigned to Miller, Le Cocq & Co., by the claimant, with directions to dispose of the same promptly, to the best advantage, and pass the proceeds to his credit, subject to his future instructions. And in a subsequent letter, he directed the consignees to invest the proceeds in coffee and ship it to him in Baltimore, by the Invincible, if she should return at the fairgoing rate of freight, otherwise, by the barque Delawarean, or some other good vessel.

The flour in question was accordingly delivered to Miller, Le Cocq & Co., and the Invincible being about to sail on her return voyage, before it was sold, they purchased, under the direction of the claimant, as above stated, one hundred and thirty bags of coffee, charging the amount paid for it as a debit against the proceeds of the seven hundred and twenty-seven barrels of flour consigned to them. The bill of lading, signed by Davies, the master of the Invincible, states that it was shipped by Miller, Le Cocq & Co., to be delivered at the port of Baltimore, to Lambert Gittings, or his assigns, he or they paying freight for the said goods,

fifty cents per bag, with five per cent. primage.

The adventure proved to be an unfortunate one; the net proceeds of the flour did not pay the amount advanced by Gittings, and before the Invincible arrived at the port of Baltimore, Anderson's Son, the charterer, had stopped payment, and there was due for freight, under the charter-party, $3682.58. Under these circumstances, the master refused to deliver the coffee, upon payment of the freight mentioned in the bill of lading, and filed his libel stating that the coffee was put on board as the return cargo, by the agents of Anderson's Son, at Rio Janeiro, and praying that it might be sold for the payment of the freight due under the charter-party. Upon this libel, Lambert Gittings intervened, claiming the coffee as his property, shipped on his account by his agents, and praying that the same might be delivered to him, upon payment of the freight and primage mentioned in the bill of lading.

It is admitted, that the coffee, at the port of Baltimore, is not of sufficient value to pay the amount advanced by the claimant. There is no imputation of bad faith on either side; both parties have evidently acted fairly and honestly, and the difficulty between them has arisen from the inability of Anderson's Son to comply with the contract they made with the agents of the ship-owners.

The question before the court is, what are the rights of these respective parties now before the court, under this contract? For, although the first bill of lading for the outward cargo is signed by Clopton for the master, and the second by the master, who joined with Clopton in making the charter-party, and these bills of lading state the freight on the flour to Rio to be fifty cents per barrel, yet it is obvious, that these instruments were not intended to supersede the charter-party, or waive the rights which the shipowner had under it. In the letter of Anderson's Son, of the 22d of May, before referred to, he informs Gittings, that the filling up the bills of lading with the freight specified was his own act; and it appears to have been done for the purpose of entitling Anderson's Son to receive at Rio, for his own use, the amount therein mentioned. There is no intimation in his letter, that the provisions of the charter-party were waived, by a new contract in relation to this flour, and the freight, it appears, was, in fact, paid to Maxwell, Wright, & Co., the agents of the charterer, to whom he had consigned the ship.

If the coffee is regarded as the property of Anderson's Son, and shipped by his agents, and the interest of Gittings nothing more than a lien upon it, it would, undoubtedly, be liable to the whole amount of the freight due under the charter-party. The freight, it is true, is regulated by the quantity of flour carried on the outward voyage, and no additional freight is to be charged on the homeward cargo: but the freight agreed upon was the compensation for the round voyage, and the balance due after the payment provided for at Rio, was due on the delivery of the return cargo at Baltimore.

There is, indeed, no express stipulation that the delivery is to be made upon the payment of the whole freight; yet, as between the charterer and ship-owner, this is always implied, unless the terms of the charter-party show the contract to have been otherwise; and that the cargo, by the agreement of the parties, was to be delivered before the freight was paid. If the interest which Gittings acquired in the flour was a mere lien, which attached itself to the proceeds, and to the coffee purchased with the proceeds, then undoubtedly, the lien for freight would be the prior and preferred one, and his lien postponed until the whole freight was satisfied.

But I think the right of Gittings to the coffee was not a mere lien; it was something more; it was his property, and Anderson's Son had no right to the possession or control of it; nor to the proceeds, unless a surplus remained, after satisfying the amount to secure which the flour had been transferred to Gittings. The coffee was not purchased or shipped by the agents of the charterer; and was never in their possession, nor under their control. It was purchased for Gittings, by his agents, and shipped to him, and at his risk, under his instructions. It is true, it was purchased out of the proceeds of the 727 barrels of flour; but the lien of the ship-owners upon the return cargo, under this charter-party, did not depend upon the funds with which it was purchased. There is no covenant that the proceeds of the outward cargo should be invested in a homeward one; and if this coffee was the property of the charterer, the lien would be precisely the same, whether it was brought with the proceeds of the flour, or with any other funds. The circumstance that it was purchased with the proceeds of the outward cargo, therefore, does not, of itself, make it liable for the whole freight, and is of no further importance, than as a fact to be considered in connection with the other testimony in the case, in determining whether the claimant's interest in the coffee, before and at the time of the shipment, was a lien only, or a right of property.

A good deal of the argument has turned upon the question, whether, in this transaction, the claimant is to be regarded as a mortgagee, or as a purchaser of the flour. It is very clear, that it was a mortgage and nothing more; but that question is not material to the decision; for to the extent of his interest, his rights stand on the same ground, as if he had been the purchaser. This point was decided by the supreme court, in Gibson v. Stevens, 8 How. 399, 400, where, in a case analogous to this, the court said, that the mortgagee, to the extent of his advances, was a purchaser, and that the mortgagor retained nothing but an equitable interest in the surplus, if anything remained after satisfying the claims of the mortgagee. And the same principle was applied by the court to the case of a bill of lading, in Conard v. Atlantic Ins. Co.. 1 Pet. [26 U. S.] 441. In that case, the bill of lading was endorsed and delivered, as a security for money lent, in like manner with the case before us; and the court held, that the interest of the mortgagor, or assignor of the bill of lading, was nothing more than a resulting trust in the surplus, if any remained after satisfying the debt intended to be secured. To the extent of his advances, therefore, Gittings is to be considered the purchaser, and as the owner of the flour, from the time of the assignment and delivery of the bills of lading. He, however, purchased subject to subsisting claims; and whatever rights the ship-owners had, at that time, acquired under the charter-party, either as to outward or inward cargo, remained unchanged.

Now, in relation to the 727 barrels of flour, there was no lien, except for the freight to be paid at Rio. There is no allegation that this stipulation of the charter was not complied with, or that this flour was liable to be detained by the ship-owner, or improperly delivered by the master. The consignees of the claimant paid, it seems, all that was demanded or due upon it as freight. and the flour was delivered to them, and received by them, as the property of Gittings. to be disposed of in every respect as he might think proper. The possession of the agents of the claimant was his possession; and he, therefore. held the property in, and the possession of, this flour, on shore at Rio, free and discharged from any lien upon it for freight; and consequently. when the flour was sold, there could be no lien on the proceeds. He was not bound to invest them in a return cargo, and if he did so, he was not bound to ship it by the Invincible.

The proceeds were in his hands, and his exclusive property, to the extent of his advances; and he was not restricted in the disposition he might choose to make of them, by any contract with the charterers on his part, nor by any contract or covenant between the charterers and the ship-owners, made previous to the assignment to him. His agents were expressly instructed, if they shipped by the Invincible, to ship at the fair going rate of freight, and had no authority to place it on board the barque upon any other terms. Under these circumstances, the coffee was purchased with his money, and shipped as his property, at the ordinary freight. If the bill of lading signed by the master was in violation of his duty, or inconsistent with the charter-party, it would certainly not impair the rights of the ship-owners; but it was his duty to receive on board, from individual shippers. any cargo that might be offered at the ordinary freight: it was no more in violation of the charter-party to receive and transport the goods of Gittings than of any one else. There being no stipulation in the charter-party that the proceeds of the flour should be invested in a return cargo. there can be no more ground for charging his coffee with the whole freight, than the goods of any other individual who shipped a homeward cargo; and it will hardly be said. that the property of every individual shipper. under a charter-

party like this, even if he had notice of its terms, would be liable for the whole freight, or any freight beyond that of its transportation.

This charter-party does not contain the usual clause by which the owner binds the ship, and the charterer binds the cargo to the performance of all the covenants in the charter-party. Upon general principles of law, the merchandise is bound for its own transportation only; and its liability cannot be extended further, except by stipulations in the charter-party under which the voyage was performed.

The cases referred to are distinguishable from this, and were determined upon principles which do not apply to the case before me. In the case of Faith v. East India Co., 4 Barn. & Ald. 636, the goods were purchased in the foreign port, by the agents of the charterers, for and on account of the latter; and although they were shipped, by the bill of lading, in the name of these agents, yet they were marked with the initials of the charterers, and the letter of the shippers to the consignees directed them to account with the charterers. The claimants were these consignees, and they had advanced money to enable the charterers to purchase the outward cargo, but they had no assignment of the bill of lading, and no property in the goods shipped to, and sold at the foreign port; nor was the return cargo purchased for them or with their money, but for and on account of the charterers themselves, and with their means in the hands of their consignees, at the outward port.

Besides, the transaction was obviously collusive, and intended to deprive the ship-owner of his lien for freight on the goods of the charterers. The freight for the round voyage was sixteen pounds per ton of the vessel. The master was one of the charterers in interest, although not named in the instrument, he had a joint interest with the charterers in the adventure, and was appointed master at his request; and he was expressly required by the instructions of the ship-owner, "to sign all bills of lading with the clause of freight payable according to charter-party." The master (Chivise), finding, after his arrival at the foreign port and landing the cargo, that the adventure would prove a losing one, retired from the command of the ship, and concurred with the consignees in appointing a new one; and the new master signed bills of lading for the goods which were purchased, as above mentioned, for the charterers, stating in the bills of lading that the goods were to be transported for the ordinary freight. This was in direct violation of the instructions of the ship-owner; and it was evidently a contrivance to deprive the ship-owner of his lien for freight on the return cargo, in order to pay, in preference, a debt due to the consignees of the return cargo, who had advanced money for the outward voyage. The

court so regarded the transaction, and it is so treated in their opinions, especially in that of Chief Justice Abbott.

In the case of Gracie v. Palmer, 8 Wheat. [21 U. S.] 605, the contract of affreightment was for a round voyage, from Philadelphia to Madeira, and thence to Bombay and Calcutta, and home to Philadelphia; thirty-three thousand dollars to be paid as freight for the whole voyage at her home port, before the return cargo was delivered. The charterer sailed in the vessel, and being unable, at Calcutta, to obtain a full cargo on freight, for the return voyage, entered into an agreement with Palmer, that if he would make him an advance, to purchase the merchandise, the goods should remain in Palmer's possession, while they remained in Calcutta; and that he would deliver to him a bill of lading stipulating for the delivery of the goods to the agents of Palmer in Philadelphia, free of freight. This agreement was made with the consent of the master, and the money was advanced, and the goods purchased accordingly by the charterer; they were shipped as the goods of the charterer, and on his account and risk, to be delivered to a certain house in Philadelphia, named in the bill of lading, the freight, as stated in the bill of lading, having been settled at Calcutta.

In this case, therefore, the goods were purchased by the charterer himself, and shipped on his account and risk; and by the terms of the charter-party, the freight was to be paid to the ship-owner in Philadelphia, before the delivery of the return cargo; the master had no authority to alter this contract, nor to receive the freight at a foreign port; and in truth, no freight was paid. The principle upon which the case turned, and upon which it was decided, is briefly and clearly stated in the opinion of the court.

In page 634 of the report, Mr. Justice Johnson, who delivered the opinion of the court, says: "The goods are expressly laden on board as the property of Chambers (the charterer) on his account and risk; and the question is, not how far his contract may exempt the goods of another from freight, but how far he may incumber his own goods with a lien, which shall ride over or supersede their general liability for the freight." And it must be observed, that nothing more was demanded by the ship-owner, than the freight usually demanded on such goods from India: the freight for the whole voyage was not claimed.

The case before me, in every material circumstance, differs from this. Here the goods were not purchased by the charterer, nor for him by his agents; nor were they shipped as his property, nor at his risk; they were charged with the usual freight on such goods from Rio, which the claimant has offered to pay; and there is nothing in the bill of lading signed by the master, at

variance with the terms of the charter party.

The case of Campion v. Colvin, 3 Bing. N. C. 17, is equally distinguishable from the present. The facts and the points decided in that case are summed up in the opinion of Tindal, C. J., on page 28. "In the first place," says the chief justice, "the outward cargo was consigned to Messrs. Colvin & Co., in Calcutta, the persons who were. the agents of Gooch (the charterer), himself; in the next place, the return goods were purchased by advances made by Colvin & Co. to Gooch, upon the security of the outward cargo, which still remained in their hands; in the third place, the case expressly says, these goods were and still are the property of Gooch, and by the bill of lading, were consigned on his part to some person in London. Are we to say upon that, that the particular mode of consigning these goods, which Gooch, the owner, thought proper to adopt, should vary the real situation of the parties?" This summary is sufficient to show how essentially the case of Campion v. Colvin differs from the present in its circumstances, and how different the point decided in that case is from the one now before me.

As relates to the case of Small v. Moates, 9 Bing. 574, it would be perfectly analogous to this, if the matter in dispute here was the freight payable at Rio, on the flour, according to the terms of the charter-party. As I have already said, the transfer or sale of the property, after it was shipped by Anderson's Son, could not deprive the shipowner of any lien upon it, to which he was entitled against Anderson's Son, by virtue of the charter-party. But there is no dispute about the freight payable at Rio, upon the delivery of the outward cargo; the claim goes further, and insists that a lien for the whole freight attached to the outward cargo shipped by Anderson's Son, adhered to the proceeds, after it had been delivered to the purchaser, and followed the merchandise bought by him with the proceeds, and shipped on board the chartered ship, as his property, and on his own account and risk. No case has extended the lien of a ship-owner so far; and for the reasons stated in this opinion, I think it cannot be so extended in the case before me, and shall decree accordingly. If the coffee, at the port of Baltimore, was worth more than the amount for which it was assigned to the claimant, the surplus would be liable to the whole freight due the ship-owners, and the order in favor of Davenport would be no obstacle to the recovery. But as it is admitted that there will be no surplus, it is liable only for its own freight from Rio de Janeiro.

I have looked into the case of The Volunteer [Case No. 16,991], which, at first view, seemed to have some analogy to this; for there the proceeds of the outward cargo, then on board, were assigned, and the inward cargo purchased with these proceeds was held liable for the whole freight stipulated in the charter-party. But this assignment, it appears, was not made to a purchaser or mortgagee, but was an assignment for the benefit of creditors; the charterer having become bankrupt during the outward voyage, of course, these assignees stood in his shoes; and the assignees had no greater or superior rights in the return cargo, than the charterer himself would have had, if he had not become insolvent; nor, indeed, were any greater rights claimed for them, as is evident from the opinion of the court.